UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| CRISTINA PAULOS, | Case No. 2:13-CV-1546 JCM (PAL) |
| Plaintiff(s), | ORDER |
| v. | |
| FCH1, LLC, et al., | |
| Defendant(s). | |

Presently before the court is a motion for summary judgment submitted by the Las Vegas Metropolitan Police Department (hereinafter "LVMPD"), as well as officers Aaron Baca, Jake Von Goldberg, and Jeffery Swan (collectively hereinafter "LVMPD defendants"). (Doc. # 33). Plaintiff Cristina Paulos filed a response, (doc. # 39), and LVMPD defendants filed a reply, (doc. # 43).

Also before the court is a motion for summary judgment submitted by defendant FCH1, LLC (hereinafter "Palms"). (Doc. # 35). Paulos filed a response, (doc. # 40), and Palms filed a reply, (doc. # 44).

Also before the court is a partial motion for summary judgment regarding punitive damages submitted by Palms. (Doc. # 34). Paulos filed a response, (doc. # 40), and Palms filed a reply, (doc. # 42).

**I.    Background**

This case arises out of an incident where a police officer detained a suspect who attacked him by forcing her to the ground. The suspect received second and third degree burns as the result of being restrained on the hot asphalt for several minutes. Officer Baca, who brought Paulos to the ground and handcuffed her, is the officer primarily involved in the incident. Paulos asserts multiple

**James C. Mahan**
**U.S. District Judge**

1  claims against LVMPD, officer Baca, and officers Swan and Von Golberg, who arrived later on
2  scene. Paulos also brings claims against FCH1, LLC, the owner and operator of the Palms casino
3  and resort hotel, for the participation of one of its security guards, Jeannie Houston, in the arrest.[1]

4        The incident took place on August 7, 2011. In her deposition, Paulos attests to not
5  remembering many of the underlying events, including how she ended up restrained on the ground.
6  (Doc. # 39-1 pp. 144–45). However, two different Palms security cameras captured much of the
7  incident on video.[2] A comparison of this footage, Paulos' own deposition testimony, and LVMPD
8  defendants' presented evidence reveals that there is no genuine dispute of material fact in this case.

9        The incident began at about 3:13 P.M., when Paulos' vehicle jumped a median and entered
10 the intersection in front of an exit from Palms, colliding with another vehicle. Paulos continued
11 driving the short distance into the exit and collided head-on with a separate vehicle. Shortly
12 thereafter, Paulos is clearly seen rapidly leaving the scene of the accident. (Video A at 15:14:32).
13 She then returned to the scene, and the footage shows her sitting in the passenger seat of the second
14 vehicle she struck. The apparent owner of the vehicle reached across Paulos in order to remove
15 the keys from the ignition. (Video B at 15:16:32).

16       By this time, officer Baca, who was in the area during the course of his normal shift, arrived
17 on scene in order to evaluate the situation. As Paulos exited the vehicle she struck, its owner told
18 officer Baca that she was attempting to steal the vehicle. Officer Baca therefore approached Paulos
19 in order to speak with her. It is clear from the footage that the officer had not drawn any type of
20 weapon or even handcuffs from his utility belt and approached Paulos in a calm manner. (Video
21 B at 15:16:48).

---

[1] Paulos also brought suit against Houston. While attorneys for LVMPD defendants also originally listed themselves as attorneys for Houston (*see, e.g.*, doc. # 5), the parties later stipulated that this was in error. (Doc. # 14). Since then, Houston has failed to file an answer to Paulos' complaint, and the clerk of the court entered an order of default against her. (Doc. # 22). Therefore, none of these motions for summary judgment apply to Houston, and the court will only refer to her for the purpose of discussing the case's facts.

[2] Each video camera captures different key portions of the incident, and the court will therefore refer to their content separately. The black-and-white video will be referred to as "Video A," while the color video will be referred to as "Video B." (*See* doc. # 33 p. 5 n. 2). Time cites will be given in the twenty-four hour format that both videos use (e.g., 3:00 P.M. is 15:00:00).

**James C. Mahan**
**U.S. District Judge**

- 2 -

1 In response, Paulos turned her back to officer Baca and walked a short distance away from him. After the officer ordered her to stop, Paulos turned and then lunged at officer Baca towards his waist with both hands extended. (Video B at 15:16:54). He claims that she was reaching for his gun and that he felt her hand make contact with it. Whether Paulos was specifically reaching for the weapon and whether she actually made contact is not clear from the video.

In order to thwart the attack, officer Baca immediately pushed Paulos a short distance away. Although stumbling backwards, Paulos remained standing. Officer Baca quickly closed the distance between them and attempted to restrain Paulos from behind. Struggling to do so, he forced her to the ground. (Video B at 13:17:02). Paulos was thus lying on the asphalt pavement that constitutes the exit lane coming out of Palms.

For the next two minutes, officer Baca continued his attempts to handcuff Paulos. (Video B at 15:17:04–18:35). He claims that Paulos resisted arrest throughout this time period. At the onset, however, trees and surrounding bystanders obstruct the camera's view. Nonetheless, officer Baca is seen calling over Palms security officer Jeannie Houston to assist him in restraining Paulos, which she proceeded to do. (Video B at 15:17:28). By this point, the camera shows Paulos struggling against officer Baca and Houston until they finally succeed in handcuffing her. (Video B at 15:17:38–18:35).

Less than two minutes later, additional LVMPD officers arrived on scene. (Video B at 15:19:50). The color footage ends at this points and the black-and-white security camera's view is obscured. It is therefore not clear exactly how long Paulos remained on the ground after back-up arrived. However, LVMPD defendants assert that the timeframe can be two minutes and forty seconds at most, because back-up arrived at 15:19:50 and Paulos is seen standing at 15:22:30. (Video A). LVMPD defendants further assert that Paulos is seen seconds later walking with officers away from the pavement towards a nearby grassy area.

It is not clear to the court that the figure in this footage segment is definitively Paulos. However, her opposition to LVMPD defendants' motion to dismiss, which disputes several of the "undisputed facts" in defendants' motion, never disputes these specific, key assertions. (Doc. # 39,

pp. 6–7). The court will therefore accept that the figure is Paulos and that she remained on the ground for at most two minutes and forty seconds after additional officers arrived on scene. This means that Paulos spent a little more than five minutes on the ground in total.

After Paulos was situated in the grassy area, several other officers spoke with her, including officer Swan and Sergeant Jason Harney, officer Baca's immediate supervisor. At no point did Paulos complain to any of the officers of burns or any other type or injury. (Doc. # 33-2 pp. 79–83). Nor did any of the officers note seeing any injury in their reports. Officer Swan did note, however, that Paulos' behavior was erratic at this point. She would be crying, then suddenly happy, then suddenly screaming. (Doc. # 33-5 p. 22). Paulos both screamed to herself and cursed at the officers. It was this behavior and the fact that she had just been in a car accident that led to her being submitted for medical treatment. (*see* doc. # 33-9 p. 2; doc. # 33-3 p. 91).

After paramedics arrived on scene, they transported Paulos to University Medical Center, where she was treated from August 7–9. Paulos' own medical expert, Dr. Matthew Young, testified at his deposition that this treatment was primarily related to the psychosis she exhibited during the incident. (Doc. # 33-15 p. 17–20). Despite how visually severe Paulos' burns later appeared,[3] the application of a burn cream was the only burn-related treatment she received during this initial hospital stay. (*Id*; doc. # 33-10).

This is not surprising. As explained by both Dr. Young and Dr. Andrew Silver, the burn specialist who eventually treated Paulos, a burn may not seem serious at first but can reveal itself to be more severe over the course of several days. (Doc. # 33-15 pp. 18–19; doc. # 39-4 pp. 14–16). This process is called "burn conversion." (Doc. # 39-4 pp. 14–15).

When University Medical Center discharged Paulos on August 9, her discharge sheet referenced only blisters that had developed on her body. (Doc. # 39-4 pp. 21–22). It was not until August 11 that Paulos began receiving treatment at Lyons Burn Care Unit. There, she received skin graft surgeries. (*Id*. at p. 27).

Paulos filed a complaint on August 14, 2012, and a second amended complaint on August 5, 2013. (Doc. # 2 Exh. A,C). Defendants then removed the instant action to federal court.

---

[3] It is unclear when photos of Paulos' burns were taken.

Paulos' complaint asserts five causes of action: (1) a negligence claim against Palms, Houston, and other unnamed defendants; (2) a negligence claim against LVMPD defendants; (3) a false imprisonment claim against Palms, Houston, and other unnamed defendants; (4) a claim of excessive force in violation of the Fourth Amendment under 42 U.S.C. § 1983 against LVMPD defendants; (5) a failure to train, direct, or supervise (*Monell* municipal liability) claim against LVMPD. (Doc. # 2 Exh. C).

LVMPD defendants move for summary judgment for claims two, four, and five. (Doc. # 33). Palms moves for summary judgment for claims one and three. (Doc. # 35). It also moves for partial summary judgment on Paulos' request for punitive damages. (Doc. # 34).

## II.     Legal Standard

The Federal Rules of Civil Procedure provide for summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).

. . .

. . .

In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that

**James C. Mahan**
**U.S. District Judge**

- 5 -

1  party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

. . .

. . .

**III.   Discussion**

Defendants seek summary judgment on each of the five claims in Paulos' second amended complaint. Because the fourth claim (Fourth Amendment excessive force) and the fifth claim (a

*Monell* municipal liability claim) are the only federal questions in this case, the court will address them first.[4]

### A. Fourth Amendment excessive force (claim four)

Paulos' fourth claim seeks to hold LVMPD; officers Baca, Von Goldberg, and Swan; and other unnamed LVMPD employees, liable for violations of her Fourth Amendment rights. Paulos brings this claim under 42 U.S.C. § 1983, asserting that officer Baca exercised excessive force during his arrest of her on August 7, 2011, and that the other officers failed to prevent this constitutional violation.

As an initial matter, it is well established that "a local government body [such as a police department] cannot be held liable under § 1983 'solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory.'" *Jackson v. Barnes*, 749 F.3d 755, 762 (9th Cir. 2014) *cert. denied*, 135 S. Ct. 980 (2015) (quoting *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). The court will therefore address the liability of the Las Vegas Metropolitan Police Department only in regards to Paulos' *Monell* claim.

In response to Paulos' claim of excessive force, officer Baca argues that his actions were reasonable as a matter of law and that in the alternative, he cannot be held liable on this claim under the doctrine of qualified immunity. Because a qualified immunity analysis addresses whether a defendant violated a constitutional right, it will be combined with the excessive force analysis.

#### 1. Legal standard- qualified immunity for excessive force

Where a plaintiff has stated a valid cause of action under 42 U.S.C. § 1983, government officials sued in their individual capacities may raise the affirmative defense of qualified immunity. *See Spoklie v. Montana,* 411 F.3d 1051, 1060 (9th Cir. 2005); *see also Goodman v. Las Vegas Metro. Police Dep't*, 963 F. Supp. 2d 1036, 1058 (D. Nev. 2013). Qualified immunity "balances two important interests–the need to hold public officials accountable when they exercise

---

[4] Paulos' second amended complaint contains a typographical error, labeling both the false imprisonment claim and the separate excessive force claim as "third cause of action." The court will therefore refer to the excessive force claim as the "forth claim" and the *Monell* claim as the "fifth claim."

**James C. Mahan**
**U.S. District Judge**

- 7 -

1  power irresponsibly, and the need to shield officials from harassment, distraction, and liability
2  when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It
3  protects government officials performing discretionary functions from liability for civil damages
4  as long as their conduct does not violate "clearly established statutory or constitutional rights of
5  which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).
6  "The principles of qualified immunity shield an officer from personal liability when an officer
7  reasonably believes that his or her conduct complies with the law." *Pearson*, 555 U.S. at 244.

8  Deciding whether an officer is entitled to qualified immunity is a two-step analysis. First,
9  the court assesses whether the plaintiff has alleged or shown a violation of a constitutional right.
10  Second, the court decides whether the right at issue was clearly established at the time of the
11  defendant's alleged misconduct. *Pearson*, 555 U.S. at 232. Meeting either prong will establish
12  qualified immunity. *See Davis v. City of Las Vegas*, 478 F.3d 1048, 1056 (9th Cir. 2007). The
13  Supreme Court has instructed that district judges may use their discretion in deciding which prong
14  to address first based on the circumstances of the case at hand. *See Pearson*, 555 U.S. at 236.

15  **2.     Violation of a constitutional right**

16  Turning to the first step, whether officer Baca violated a constitutional right through
17  excessive force, the court "examine[s] the use of force to effect an arrest in light of the Fourth
18  Amendment's prohibition on unreasonable seizures." *Deorle v. Rutherford*, 272 F.3d 1272, 1279
19  (9th Cir. 2001) (citing *Graham v. Connor*, 490 U.S. 386 (1989)). "Determining whether the force
20  used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful
21  balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests
22  against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal
23  quotation marks omitted).

24  **a.     The nature and quality of intrusion**

25  This side of the balancing test "assess[es] the quantum of force used to arrest [a plaintiff]
26  by considering the type and amount of force inflicted." *Deorle*, 272 F.3d at 1279 (internal quotation
27  marks omitted). At the onset, it is important to note that the force that officer Baca used against
28  Paulos is different than most excessive force cases in regards to both type and amount.

**James C. Mahan**
**U.S. District Judge**

- 8 -

In arresting Paulos by bringing her to the ground and handcuffing her, officer Baca did not use any seizure devices that the Ninth Circuit has classified as at least an "intermediate" use of force, such as pepper spray, a baton, or a taser. *See, e.g.*, *Young v. Cnty. of L.A.*, 655 F.3d 1156, 1161 (9th Cir. 2011) (holding that "[b]oth pepper spray and baton blows are forms of force capable of inflicting significant pain and causing serious injury . . . [and] [a]s such, both are regarded as 'intermediate force . . . .'"); *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (concluding that the use of tasers "constitute an intermediate, significant level of force . . . .").

Even without the use of such devices, the way in which officer Baca manually restrained Paulos is vastly different from incidents the Ninth Circuit has found excessive. *See, e.g.*, *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003) (finding that officers applying their weight to a suspect's neck and torso while he lay handcuffed on the ground was "severe and . . . capable of causing death or serious injury."); *Davis*, 478 F.3d at 1055 (deeming an officer's conduct "extremely severe," when he slammed a handcuffed suspect head-first into a wall, pressed his knee into his back, and punched him in the face). In contrast to these types and amounts of force, the court finds that officer Baca used minimal force in arresting Paulos.

Additionally, Paulos' own security expert, Steven Baker, explicitly stated that he had no criticism of how officer Baca brought Paulos to the ground and handcuffed her. (Doc. # 33-18 pp. 50–52). Baker also opined that he had little to no criticism of officer Baca keeping Paulos on the ground until the point that additional officers arrived on scene. (*Id.*). Baker readily agrees that the type of physical exertion that officer Baca underwent in restraining Paulos would have "absolutely" tired him. (*Id.*). The plaintiff's own evidence supports the officer's assertion that he was too winded from the struggle with Paulos to move her off the ground. (Doc. # 33-3 p. 85).

In turn, the only use of force actually in dispute in this incident is LVMPD defendants' decision to allow Paulos to continue lying on the hot asphalt for the approximately two minutes and forty seconds between additional officers arriving on scene and them lifting her to her feet. The court must therefore weigh this decision and the second and third degree burns Paulos incurred during her entire time on the asphalt against the government interests at stake.

    **b.**  **The countervailing governmental interests at stake**

**James C. Mahan**
**U.S. District Judge**

In *Graham*, the Supreme Court created three factors for measuring the government's interest in conducting a particular arrest: (1) the severity of the suspect's crime, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight. 490 U.S. at 396. Beyond these specific factors, courts also look at the totality of the circumstances. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011).

In weighing these factors against the nature and quality of instruction, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer in the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. The court must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Mattos*, 661 F.3d at 442 (quoting *Graham*, 490 U.S. at 396–97).

This inquiry is objective. *Graham*, 490 U.S. at 397 ("[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them . . . ."). A reasonable use of force encompasses a range of conduct, and the availability of a less-intrusive alternative will not render conduct unreasonable. *Wilkinson v. Torres*, 610 F.3d at 551 (citing *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).

. . .

. . .

> i.   *Factors 1 & 2: the severity of the crime and the immediate threat of safety of the officers or others*

The court will combine these two factors, because the only crime at issue is Paulos' assault against officer Baca. The latter factor, whether Paulos posed an immediate threat to the safety of officer Baca or others, is the most important *Graham* inquiry. *See, e.g.*, *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005). An officer's good intentions will not make an objectively unreasonable use of force constitutional. *Graham*, 490 U.S. at 397. When the court considers whether an immediate threat existed, a "simple statement by an officer that he fears for his safety

1  or the safety of others is not enough; there must be objective factors to justify such a concern."
2  *Mattos*, 661 F.3d at 441–42 (quoting *Deorle*, 272 F.3d at 1281).

3  As an initial matter, LVMPD defendants assert that Paulos' conduct prior to her contact
4  with officer Baca (i.e., causing the accident, fleeing the scene, and possibly attempting to steal a
5  vehicle) should be included in weighing the severity of her actions. While hindsight might suggest
6  that some of these actions were criminal, officer Baca himself admits that he approached Paulos
7  to only determine what had happened and that he did not believe at the time that she had committed
8  any crime. (Doc. # 33-3 pp. 62, 88). Since these initial events did not enter in officer Baca's
9  decision to arrest Paulos and use force in doing so, the court will not weigh them in this
10 consideration.

11 Nonetheless, Paulos did commit a serious crime when she attacked officer Baca and
12 therefore posed a serious threat to him and bystanders. While not denying the attack itself, Paulos
13 disputes the officer's contention that she was reaching for his firearm. She asserts that the video
14 evidence is not clear to this end and that the question should therefore be left for a jury. This
15 argument is not convincing.

16 This case is not a criminal prosecution of Paulos, where a determination that she attempted
17 to use a deadly weapon would create an aggravating condition in a crime. *See* NRS § 200.471(2)
18 (increasing the sentence for assaulting an officer with "the use of a deadly weapon or the present
19 ability to use a deadly weapon"). Instead, an excessive force claim is premised on the reasonability
20 of an officer's conduct and whether objective factors supported his safety concerns.

21 Here, the incident's objective factors made it reasonable for officer Baca to believe that
22 Paulos was reaching for his firearm and that she was therefore a serious threat to him and all
23 involved. Paulos' own security expert asserts that in the security footage, she "is seen to reach
24 toward the right waist area of the officer . . . ." (Doc. # 33-17 p. 4). Even without considering the
25 firearm itself, it is undeniable that Paulos lunged at officer Baca after he had calmly approached
26 her mere seconds earlier. This erratic, irrational, and aggressive behavior indicated that Paulos was
27 dangerous. Therefore, both factors 1 and 2 weigh in favor of LVMPD defendants.

28            ii.      *Factor 3: whether the suspect actively resisted arrest or attempted*

**James C. Mahan**
**U.S. District Judge**

- 11 -

*to evade arrest by flight*

Turning to the third *Graham* factor, there is no doubt that Paulos resisted arrest for at least some portion of her time on the ground. The segments of the security footage not obscured clearly show her struggling against both officer Baca and the Palms security guard. (Video B at 15:17:38). Furthermore, both Paulos' security expert and her police practices expert acknowledge that the footage shows her struggling. (Doc. # 33-17 p. 4; doc. # 39-7 p. 7).

Despite this evidence and the fact that Paulos claims limited memory of the incident, she denies ever struggling with officer Baca. (Doc. # 39-1 p. 48). Nonetheless, the court is not required to accept a version of events in contradiction to available evidence. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that when a non-moving party's version of the facts "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt [it] for purposes of ruling on a motion for summary judgment."). The court therefore concludes that Paulos resisted arrest.

While analysis of this factor would normally end at this point, the court must consider how it applies to the fact that LVMPD defendants allowed Paulos to lie on the ground even once additional officers arrived. Her security expert asserts that the availability of more officers and their "caged" police vehicles necessitated immediately moving Paulos into one of these vehicles. (Doc. # 33-18 p. 51). The court agrees that the presence of additional officers would naturally begin to mitigate the severity of a suspect's resistance once she is restrained on the ground.

Nonetheless, the court has already found that there was at most a two minute and forty second delay between the additional officers' arrival and Paulos being lifted off the ground. Such a delay is not unreasonable considering that the officers arrived to a scene involving a multi-vehicle accident, multiple bystanders, an individual restrained on the ground, and a winded officer. It is thus reasonable to take a few minutes to assess the scene before moving a suspect that poses an unknown level of danger. This conclusion is further supported by the fact that Paulos admits she never verbalized her discomfort to any officer at any time. (Doc. # 33-2 pp. 79–83). Therefore, this factor weighs in the favor of LVMPD defendants.

**James C. Mahan**
**U.S. District Judge**

### *iii.* *Other factor: mental illness*

Finally, the court addresses Paulos' contention that the disturbed mental state she displayed throughout the incident should be a mitigating factor in assessing the governmental interest at stake. In this regard, the Ninth Circuit has rejected a "per se rule establishing two different classifications of suspects: mentally disabled persons and serious criminals." *Deorle,* 272 F.3d at 1283. It has instead "emphasized that where it is or *should be apparent* to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham,* the reasonableness of the force employed." *Id.* (emphasis added).

The rationale for this policy is that "[t]he problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is . . . resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal . . . ." *Id*. at 1282–83 (finding that firing upon an emotionally disturbed suspect with a less-than-lethal round was unreasonable when the officer observed his state for over half an hour. *Id.* at 1283.

While it is clear in hindsight that Paulos was suffering from some form of psychosis during the incident, officer Baca never had a chance to make this observation. Unlike the officer in *Deorle*, he did not have time to observe her state of mind; she attacked him mere seconds after he approached her. In turn, any mental illness that Paulos may have been suffering from could not have been apparent to officer Baca at the onset of the arrest. The issue therefore does not enter into the analysis.

### *iv.* *Totality of the circumstances*

While it is unfortunate that Paulos incurred such severe burns as a result of her arrest in this incident, the court finds that officer Baca's use of minimal force in restraining her was appropriate considering the objective threat she posed and her undeniable attempt to resist arrest. In light of this assessment and the lack of any genuine dispute of material fact, the court finds that officer Baca did not use excessive force in arresting Paulos. This conclusion also applies to all officers who arrived on scene after Paulos was restrained on the ground.

### 3.     **Clearly established right**

James C. Mahan
U.S. District Judge

- 13 -

1     Even if officer Baca had used excessive force against Paulos in violation of a constitutional
2 right, LVMPD defendants would still be entitled to qualified immunity if they can show that the
3 right that Paulos claims is not "clearly established." *Mattos,* 661 F.3d at 440 (citing *Pearson*, 555
4 U.S. at 223). In this analysis, courts determine "whether it would be clear to a reasonable officer
5 that his conduct was unlawful in the situation he confronted." *Deorle*, 272 F.3d at 1278–79.

6     The Ninth Circuit has developed a three-step inquiry for determining whether a right is
7 clearly established. *See Boyd v. Benton Cnty.*, 374 F.3d 773, 781 (9th Cir. 2004). First, courts must
8 examine whether "the right is clearly established by decisional authority of the Supreme Court or
9 [the Ninth] Circuit. *Id.* Next, "[i]n the absence of binding precedent, [the Ninth Circuit] look[s] to
10 whatever decisional law is available . . . including decisions of state courts, other circuits, and
11 district courts." *Id.* (internal quotation marks omitted). Finally, even when there is no relevant case
12 law available, courts analyze whether "an officer's conduct 'is so *patently violative* of the
13 constitutional right that reasonable officials would know without guidance from the courts that the
14 action was unconstitutional . . . .'" *Id.* (quoting *Deorle*, 272 F.3d at 1286) (emphasis added).

15     Here, there are no binding decisions analyzing whether restraining a suspect on asphalt hot
16 enough to cause severe burns violates the Fourth Amendment. There is, however, a district court
17 case within the Ninth Circuit, as well as two circuit court cases outside this circuit, with
18 circumstances comparable to the instant case. The court will therefore analyze whether taken
19 together, these cases carve out a clearly established right. The court will then proceed to address
20 whether officer Baca's conduct was patently violative of the constitutional right.

21     **a.     Non-binding case law**

22     In *Price v. County of San Diego*, the district court found that leaving a suspect restrained
23 on hot asphalt for several minutes did not constitute excessive force. 990 F. Supp. 1230, 1241
24 (S.D. Cal. 1998). There, officers sprayed the suspect with pepper spray and wrestled him to the
25 ground after he violently resisted arrest. *Id.* at 1234. The officers then placed the suspect in a four-
26 point restraint (a "hogtie") and allowed him to lie shirtless for several minutes on asphalt
27 approximately 133.9 degrees in temperature. *Id.* at 1235. The suspect stopped breathing and died
28 on the scene. Because the district court specifically concluded that leaving him on the hot asphalt

**James C. Mahan**
**U.S. District Judge**

- 14 -

1  did not constitute excessive force, this case does not help to clearly establish a right against being
2  placed on hot asphalt.
3   Similarly, in *Rubio v. Lopez*, the Eleventh Circuit found that restraining a suspect on hot
4  asphalt did not violate a clearly established right. 445 F. App'x 170, 173 (11th Cir. 2011). There,
5  an officer removed the suspect from his police vehicle after the suspect began kicking at the
6  windows and then "hobble-tied" him, forcing his chest and face onto the hot pavement. *Id.* at 172.
7  "While on the pavement, [the suspect] screamed that his skin was burning." *Id.* at 172–73. The
8  "incident lasted about a minute" and resulted in second degree burns. *Id.* at 174. The court
9  "conclude[d] that not every reasonable officer in [the officer's] position would have known that
10 restraining [a suspect] on the hot pavement violates the Fourth Amendment." *Id.* at 174. Therefore,
11 this case also does not help establish a right against being placed on hot asphalt.
12  Finally, in *Howard v. Kansas City Police Department*, the Eighth Circuit found that
13 officers used excessive force and violated a clearly established right when they forced an individual
14 to remain seated on hot asphalt, even after he was complaining about the resulting pain. 570 F.3d
15 984, 988. However, the court defined this right narrowly, finding that case law had "clearly
16 established that the Fourth Amendment was violated if an officer *unreasonably ignored the*
17 *complaints* of a seized person that the force applied by the officer was causing more than minor
18 injury." *Id.* at 991 (citing "a series of cases involving failure to respond to complaints of overly-
19 tight handcuffs") (emphasis added).
20  There, officers discovered that the plaintiff was an injured victim rather than a suspect after
21 they forced him to the ground. *Id.* at 989. Despite this fact, the officers ignored the plaintiff's
22 complaints that the asphalt was burning him and his request to move to a grassy area. *Id.* at 989–
23 90. The plaintiff began "moving his shoulders back and forth in an attempt to lift his back and
24 arms off the asphalt," but the officers held him down against the asphalt. *Id.* at 987. It took officers
25 four to six minutes after the plaintiff began complaining to finally place a blanket under him. *Id.*
26 at 990. As a result, he suffered second degree burns. *Id.*

**James C. Mahan**
**U.S. District Judge**

- 15 -

In turn, the officers in *Howard* violated the plaintiff's clearly established right by ignoring his consistent and explicit complaints for four to six minutes and by forcibly preventing him from moving without any justification. *Id.*

In comparing these cases, this court finds that there is no clearly established right against being restrained on hot asphalt for a brief period of time. Even in *Price* and *Rubio*, the courts did not find violations of the Fourth Amendment, despite the fact that officers there used more extreme methods of restraining the suspect on the ground than in the instant case (i.e., hog-tying or hobble-tying). Additionally, the Eighth Circuit in *Howard* limited the right it was identifying to the right against having one's complaints of pain ignored by arresting officers.

Even if the right identified in *Howard* is a clearly established right, a question this court does not reach today, it would not be applicable to the instant case. Paulos admits that she does not remember explicitly telling any of the officers on scene that she was being burned by the asphalt or was generally in pain. (Doc. # 33-2 pp. 79–83).[5] Similarly, all the officers claim that Paulos never expressed any discomfort to them. While Paulos does assert she screamed in pain for some portion of the time she was on the ground, (doc. # 33-2 p. 79), she also screamed incoherently at officer Baca before attacking him, (doc. # 33-3 pp. 15–16),[6] and later yelled to herself while seated in the grassy area (doc. # 33-5 p. 22). Therefore, it is clear that Paulos did not communicate her pain to the officers in any discernible manner.

Accordingly, the court finds that LVMPD defendants did not violate any right established by case law.

         **b.**     **Whether officer Baca's conduct was patently violative of the Constitution**

---

[5] This portion of Paulos' deposition refers to a twenty-minute period she spent on the ground. This time range, however, is based on an estimate she heard from a nurse after the incident. (Doc. # 33-2 p. 50). Asked about her personal recollection, Paulos responded: "I don't know how long I was on the ground." (*Id.*). Therefore, this speculation does not conflict with the court's earlier determination based on the security footage that Paulos spent a total of five minutes on the ground.

[6] Paulos does not deny screaming prior to attacking officer Baca, but rather claims that she does not remember doing so. She stated: "I don't know what occurred before I was placed on the ground." (Doc. # 33-2 p. 80).

**James C. Mahan**
**U.S. District Judge**

- 16 -

The Ninth Circuit has recognized that some conduct is "'so patently violative of [a] constitutional right' that reasonable officers should have known that their actions were unconstitutional without guidance from the courts." *Boyd*, 374 F.3d at 783 (quoting *Deorle*, 272 F.3d at 1286). This court finds that officer Baca's conduct does not fit this description. It is undisputed that he reasonably brought Paulos to the ground after she attacked him and then struggled to handcuff her. It would be very difficult to conclude that briefly allowing her to remain on the ground was a patent violation of the Constitution, when Paulos neither complained of injuries nor exhibited them immediately after the incident.

Based on the foregoing reasons, the court finds that officer Baca did not violate a clearly established right and thus qualified immunity applies to him and all LVMPD defendants for Paulos' excessive force claim. The court will therefore grant LVMPD defendants' motion for summary judgment on this claim.

**III.    *Monell* claim against LVMPD (claim five)**

Under *Monell,* municipal liability must be based upon the enforcement of a municipal policy or custom, not upon the mere employment of a constitutional tortfeasor. 436 U.S. at 691. Therefore, in order for liability to attach, four conditions must be satisfied: "(1) that [the plaintiff] possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation." *Van Ort v. Estate of Stanewich,* 92 F.3d 831, 835 (9th Cir. 1996) (internal quotation marks omitted).

Here, the court has already determined that LVMPD officers did not violate Paulos' Fourth Amendment rights. Accordingly, there is no liability to impute to their municipal employer (i.e., Las Vegas Metropolitan Police Department). The court therefore grants LVMPD defendants' motion for summary judgment on Paulos' *Monell* claim.

**IV.    State law claims against LVMPD defendants and Palms**

Considering the court's ruling on the instant motions, the only remaining claims in this suit are Paulos' state law claims against LVMPD defendants (negligence) and Palms (negligence and false imprisonment). The court therefore declines to exercise supplemental jurisdiction over these

James C. Mahan
U.S. District Judge

state law causes of action. *Wade v. Reg'l Credit Ass'n*, 87 F.3d 1098, 1101 (9th Cir. 1996) (holding that "where a district court dismisses a federal claim, leaving only state claims for resolution, it should decline jurisdiction over the state claims and dismiss them without prejudice").

Based on the foregoing, Paulos' remaining state law claims will be dismissed without prejudice.

## V.     Conclusion

Based on the above analysis, the court will grant LVMPD defendants' motion for summary judgment, (doc. # 33), as to Cristina Paulos' fourth claim (excessive force) and fifth claim (*Monell* municipal liability). The court will therefore decline to exercise supplemental jurisdiction over the state law claims against LVMPD defendants (negligence) and Palms (negligence and false imprisonment) and dismiss them without prejudice.

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that LVMPD defendants' motion for summary judgment, (doc # 33), be, and the same hereby is, GRANTED in part, as to plaintiff's federal claims.

IT IS FURTHER ORDERED that plaintiff's remaining state law claims against LVMPD defendants and Palms, be, and the same hereby are, DISMISSED without prejudice.

IT IS FURTHER ORDERED that Palms' motions for summary judgment, (docs. # 34, 35), be, and the same hereby are, DENIED as moot.

IT IS FURTHER ORDERED that plaintiff file her motion for default judgment against defendant Jeannie Houston within ten days of the date of this order, when the court intends to close the case.

DATED March 12, 2015.

*[signature: James C. Mahan]*
UNITED STATES DISTRICT JUDGE

James C. Mahan
U.S. District Judge